Rabbi Abraham GROSSBAUM
and Lubavitch of Indiana,
Inc., Plaintiffs,

v.

INDIANAPOLIS–MARION COUNTY
BUILDING AUTHORITY and Ronald L.
Reinking, in his capacity as General
Manager, Defendants.

No. IP 94–1801–C–H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 22, 1994.

B. Keith Shake, Henderson Daily, Withrow & Devoe, Indianapolis, IN, Nathan Lewin, Niki Kuckes, Miller, Cassidy, Larroca & Lewin, Washington, DC, for plaintiffs.

Thomas J. Costakis, Kevin W. Betz, Krieg, Devault, Alexander & Capehart, Indianapolis, IN, for defendants.

## ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

When a city puts up a Christmas tree in a "nonpublic forum," does the First Amendment require the city to allow private groups to display menorahs, Nativity scenes, and other religious symbols in the same place? At first blush, the answer appears to be no. See *Lubavitch Chabad House, Inc. v. Chicago*, 917 F.2d 341 (7th Cir.1990). Several years ago, the City of Chicago put up Christmas trees at O'Hare Airport. A Jewish group's request for permission to put up a menorah was denied. The Seventh Circuit held that the City did not violate the First or Fourteenth Amendments by putting up the Christmas trees and other secular holiday decorations while excluding religious symbols.

The central issue in the case before this Court is whether the Free Speech Clause of the First Amendment, as applied in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), now dictates a different result. This Court does not believe the *Lamb's Chapel* prohibition on "viewpoint discrimination" in a nonpublic forum applies to this situation. When a city puts up secular Christmas decorations in a nonpublic forum, it may choose to allow private groups to display menorahs, Nativity scenes, and other religious symbols there as well (at least if it is careful to comply with the Establishment Clause), but the Free Speech Clause does not require it to allow such displays.

Plaintiffs Rabbi Abraham Grossbaum and Lubavitch of Indiana, Inc. filed this action on November 7, 1994, against defendants Indianapolis–Marion County Building Authority (the "Building Authority") and Ronald L. Reinking, its general manager. Plaintiffs seek injunctive and declaratory relief to require defendants to allow them to display a menorah in the lobby of the City–County Building in Indianapolis during the eight days of Chanukah. Plaintiffs moved for a temporary restraining order and preliminary injunction because Chanukah begins at sundown on November 27, 1994. On November 8, 1994, this Court denied the request for a temporary restraining order for lack of an emergency. A hearing on the motion for preliminary injunction took place on November 18, 1994. The motion is before the Court on the parties' briefs and oral arguments, and a stipulated factual record that includes two affidavits by Rabbi Grossbaum, the affidavit of William F. Fox, and the parties' Joint Stipulations of Fact. Because the case arises under the federal Constitution and civil rights laws, this Court has subject matter jurisdiction. 28 U.S.C. §§ 1331 & 1343(a)(3). This entry constitutes the Court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52 and 65. For the reasons set forth below, the Court denies plaintiffs' motion for a preliminary injunction.

Plaintiff Grossbaum is an Orthodox Jewish rabbi affiliated with the Lubavitch Hasidic movement. He is the executive vice president of plaintiff Lubavitch of Indiana, Inc., a private, non-profit Orthodox Jewish organization in Indianapolis, Indiana. Defendant Building Authority is a municipal corporation responsible for managing the City–County Building in downtown Indianapolis. The City–County Building houses offices for various agencies and departments of the city and county governments. The lobby of the City–County Building is open to the public during business hours.

As general manager of the Building Authority, Reinking's duties include deciding whether to grant requests to use the lobby space for displays or exhibits. Requests to use the lobby are usually made in writings addressed to the Building Authority. Oral requests to use the lobby have also been made in the past. The Building Authority has produced 117 written requests for use of the lobby from 1990 through September 22, 1994. Most were granted. The exceptions were a group's third request in the same year (the Building Authority limits requests to two per year from the same group) and several recent requests to conduct sales or

fundraising (the Building Authority has recently decided not to allow such activity). Some requests for use of the lobby came from private groups, but most were from government agencies. See *Joint Stipulations of Fact*, Tab A.

From approximately 1985 through 1992, plaintiffs requested and received permission from the Building Authority to display their five-foot tall menorah in the lobby of the City–County Building during Chanukah.[1] The menorah display was accompanied each year by a sign that said, "Lubavitch wishes you a Happy Chanukah." Plaintiffs were also permitted to light the candles of the menorah. Plaintiffs paid for all expenses of the display; no public funds were used in the menorah's display. Plaintiffs are prepared to place a sign by the menorah stating that it is a private display sponsored by Lubavitch of Indiana.

The Building Authority's minutes and correspondence show that the menorah display generated some public controversy in 1992. Although the record on this point is limited, the documents indicate that both the Indiana Civil Liberties Union and the Jewish Community Relations Council had questioned the display of the menorah in a public building like the City–County Building and had urged the Building Authority to reconsider its position. See *Joint Stipulations of Fact*, Tab H.

On September 30, 1993, Reinking sent a memorandum to the Board of Directors of the Building Authority concerning topics to be discussed at the next board meeting, including the topic of a proposed "display policy" for the City–County Building. He wrote:

> The attention and publicity focused on the lobby of the City–County Building during the holiday season of 1992 pointed out the need for the Authority to have a written policy regarding displays in our building. Last year's holiday season brought newspaper articles, correspondence from the Indiana Civil Liberties Union and research into constitutional law. I am hopeful that an appropriate policy can facilitate a less

controversial season in this and future years.

On October 4, 1993, the board unanimously passed the following resolution:

> RESOLVED, that the Board of Directors of the Indianapolis–Marion County Building Authority hereby adopts the following policy on seasonal displays in the City–County Building:

> Religious displays and symbols are not permitted in the City–County Building in that the display of seasonal religious symbols in the halls of government conveys the appearance of governmental endorsement of religion in violation of the Establishment Clause of the First Amendment of the Federal Constitution.

The Building Authority initially interpreted its new policy as forbidding both plaintiffs' menorah and a Christmas tree, which the Building Authority itself had displayed in the lobby in past years. On October 8, 1993, Reinking wrote to Rabbi Grossbaum and said that the new policy would not permit display of the menorah.

On December 6, 1993, Reinking reported to the board that employees in the building were unhappy with the decision not to put up a Christmas tree. Reinking also reported that the "City Administration" had asked the Building Authority to reconsider and allow display of both the Christmas tree and the plaintiffs' menorah, or, if the menorah could not be displayed, at least to put up the Christmas tree. The board's counsel advised that the Supreme Court and other courts had "uniformly held that a Christmas tree is a secular symbol and not a religious symbol" and could therefore be displayed, but that the menorah, a Nativity scene, or a cross would be a religious symbol prohibited by the October 4, 1993, policy. The board's minutes reflect discussion of the possibility that permission for the menorah might be deemed sufficient to transform the lobby into a "public forum," which the board wanted to avoid. The board refused to change the policy that barred plaintiffs from displaying their meno-

---

1. The parties describe a menorah as a nine-pronged candelabrum that is displayed during the eight days of Chanukah and is lit each night of the festival. It is a religious symbol associated with the Jewish holiday.

rah, but instructed Reinking to erect a Christmas tree in the lobby.

Nothing in the record reveals any animosity on the part of the Building Authority against plaintiffs or their religious beliefs, or against religion in general. On this record, the new policy was intended simply to avoid the questions and controversy that the earlier display of the menorah had produced, and that future requests by these plaintiffs and other religious groups seemed likely to provoke.

The record does not reflect any further efforts by plaintiffs to display their menorah in 1993. On June 27, 1994, and August 4, 1994, however, Rabbi Grossbaum wrote to Reinking for permission to display the menorah during Chanukah in 1994. (Plaintiffs also wish to display the menorah in future years.) Reinking responded on August 9, 1994, with a copy of the 1993 policy and stated that the policy did not permit the display of seasonal religious symbols in the building. Plaintiffs filed this action on November 7, 1994. Plaintiffs base their motion for preliminary injunction only on Count One of their Complaint, which asserts that the lobby is a nonpublic forum and that the Building Authority's Policy on Seasonal Displays amounts to viewpoint discrimination prohibited by the Free Speech Clause of the First Amendment. For purposes of this motion only, the parties have stipulated that the lobby of the City–County Building is a nonpublic forum. See *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985).[2]

### Preliminary Injunction Standard

■ A motion for a preliminary injunction may be granted if the movant shows (1) a reasonable likelihood of success on the merits; (2) there are no adequate remedies at law; (3) the threat of irreparable harm if an injunction does not issue; (4) the balance of harms (to the movant if an injunction is denied and to the opponent if the injunction is granted) favors the movant; and (5) an injunction is not adverse to the public interest. *E.g., JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir.1993). In this case, the analysis of these factors essentially reduces to the first factor—likelihood of success on the merits. If plaintiffs are correct on the merits, then denial of their First Amendment rights amounts to irreparable harm. Even the temporary loss of free speech rights is generally irreparable, and a later award of damages is not an adequate remedy. See *Shondel v. McDermott*, 775 F.2d 859, 866–67 (7th Cir.1985). The balance of harms here does not tip decidedly in either direction. Determination of the public interest in this case turns on the merits. The Building Authority does not dispute any element other than likelihood of success on the merits. Accordingly, the Court's decision on the preliminary injunction is based on which side appears more likely to succeed on the merits of Count One, based on the existing factual record.[3]

### The Merits

This case is about cherished symbols, both secular and religious, and it is about constitutional rights basic to the freedom established at our Nation's birth. This case lies at the intersection of the Free Speech Clause and the Establishment Clause, both of which help protect our traditions of pluralism and religious tolerance, and the religious faith and

---

2. Count Two claims the lobby should be deemed a public forum, a limited public forum, or a created public forum, and that the Policy on Seasonal Displays amounts to content-based regulation of speech in violation of the Free Speech Clause of the First Amendment. Count Three alleges the Policy on Seasonal Displays violates the Equal Protection Clause of the Fourteenth Amendment, and Count Four alleges that the policy violates the Free Exercise Clause of the First Amendment. Because plaintiffs have chosen to base their motion for a preliminary injunction solely on Count One, the Court will not address the other counts at this time.

3. At the hearing on plaintiffs' motion, defendants complained that plaintiffs prepared their case in advance and then timed their filing to require defendants to defend "on the fly" and the Court to decide very quickly. That is, of course, often the nature of preliminary injunction litigation, and that is why the decision on this motion is not necessarily the Court's final word on the subject. It is instead this Court's effort to respond to the facts and the parties' arguments on a tight schedule.

practice of paramount importance to so many in our society. In cases like this where the constitutional values at stake are so important and seem to point in opposite directions, it would be surprising if the analytic structure of constitutional law were a neat, complete, and consistent system. It is not. The difficult cases are often decided by plurality opinions and shifting majorities in the Supreme Court. One of the challenges, therefore, is to keep the structure of abstract analytic categories and logical tests in touch with the practical realities before the courts.

Because cases dealing with religious symbols and public buildings arise in such wide varieties, it may be useful to point out what is *not* at issue here. First, this case does not address the wisdom or taste of displays of religious symbols in public buildings. Justice Kennedy has observed: "[S]ome devout adherents of Judaism or Christianity may be as offended by the holiday display as are nonbelievers, if not more so. To place these religious symbols in a common hallway or sidewalk, where they may be ignored or even insulted, must be distasteful to many who cherish their meaning." *Allegheny County v. Greater Pittsburgh ACLU,* 492 U.S. 573, 678, 109 S.Ct. 3086, 3146, 106 L.Ed.2d 472 (1989) (opinion of Kennedy, J.). As he added, however, "we have no jurisdiction over matters of taste within the realm of constitutionally permissible discretion." *Id.* at 679, 109 S.Ct. at 3146. The constitutional rules in this field do not save government officials outside the courts from exercising judgment about such displays.

Second, this case does not address the constitutionality of government displays of religious symbols. It concerns instead the constitutional standards that apply when private groups are allowed to use a certain category of public property to express their views.

Third, this case does not deal with the constitutional standards that apply to private

displays of religious symbols in what the Supreme Court calls a "public forum," such as a public park, a street, a sidewalk, and other locations that have traditionally been available to all comers to make speeches, march, carry signs, and so forth. Many cases decided in recent years have required local governments to permit private displays of religious symbols in traditional public forums.[4] Those cases do not control here, for the parties have stipulated for purposes of plaintiffs' motion for preliminary injunction that the lobby is a "nonpublic forum."

Fourth, this case is not about whether Christmas trees are "secular" or "religious" symbols. In *Allegheny County,* the Supreme Court held that a Christmas tree is a secular symbol, and the Seventh Circuit has said that arguments to the contrary now "border[ ] on the frivolous." *Lubavitch Chabad v. Chicago,* 917 F.2d at 343. That question has been settled.

Finally, nothing in this case turns on the fact that plaintiffs are Jewish and seek to display a menorah. The constitutional analysis in this case applies equally to requests by Christian groups to display Nativity scenes or crosses, or to any other religious group seeking to display a religious symbol in the same setting.

### The Free Speech Claim

■ Count One of plaintiffs' Complaint asserts a claim under the Free Speech Clause for "viewpoint discrimination." The phrase refers to Supreme Court opinions deciding the legal standards for evaluating access to what are called "nonpublic forums." *E.g., Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2147; *Cornelius v. NAACP Legal Defense and Education Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The constitutional standards for denial of access to a nonpublic forum are substantially less stringent than those applied to a traditional public forum or a "designated" or "created" public

---

4. *E.g., Chabad–Lubavitch of Georgia v. Miller,* 5 F.3d 1383 (11th Cir.1993) (*en banc*) (menorah displayed in rotunda of state capital building); *Americans United for Separation of Church & State v. Grand Rapids,* 980 F.2d 1538 (6th Cir. 1992) (*en banc*) (Nativity scene displayed in public park); *Doe v. Small,* 964 F.2d 611 (7th Cir.

1992) (*en banc*) (religious paintings displayed in public park); *Congregation Lubavitch v. Cincinnati,* 923 F.2d 458 (6th Cir.1991) (menorah displayed in public square); *Flamer v. White Plains,* 841 F.Supp. 1365 (S.D.N.Y.1993) (menorah displayed in public park).

forum." See, *e.g.*, *Cornelius,* 473 U.S. at 799–03, 105 S.Ct. at 3447–50. The government may exercise control over access to such a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2147 (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451). Plaintiffs have not argued that the Building Authority's Policy on Seasonal Displays is unreasonable. They argue instead that its prohibition on religious displays and symbols amounts to impermissible viewpoint discrimination.

The Seventh Circuit's decision in *Lubavitch Chabad v. Chicago* is a good starting point. Although the constitutional claims were framed differently, the case presented facts that closely parallel the facts in this case. The City of Chicago decorated O'Hare Airport with "Christmas trees and other traditional Christmas decorations, but the City intentionally exclude[d] religious symbols from unleased public areas." 917 F.2d at 342. Lubavitch Chabad was denied permission to display a menorah in a public area of O'Hare and claimed the refusal, coupled with the city's Christmas decorations, amounted to religious discrimination. The Seventh Circuit held that the city had not engaged in religious discrimination. The court explained that a Christmas tree is a secular symbol, its display is "without religious connotation," and the refusal to allow display of menorahs or other religious symbols did not amount to religious discrimination or an equal protection violation. 917 F.2d at 345. The city had the "option of allowing the erection of Chanukah menorahs or other religious symbols

along with the secular displays, or even including them in its own displays," but its refusal to allow any religious symbols was constitutionally permissible. *Id.*[5] In *Lubavitch Chabad,* however, the plaintiffs did not make the same constitutional argument that plaintiffs make in this case. Given the close fit between the facts in that case and in this one, the central question in this case can be stated as whether the Supreme Court's 1993 decision in *Lamb's Chapel* would require a different result in *Lubavitch Chabad* today.

Plaintiffs base their free speech argument on the following logical sequence. First, the First Amendment prohibits the government from restricting access to a "nonpublic forum" based on the viewpoint of the speaker. Second, the menorah is a religious symbol, and its public display is expressive conduct protected by the First Amendment. Third, in this case, the Building Authority allows seasonal displays that express "secular viewpoints" toward the holiday season, but expressly prohibits such displays that express "religious viewpoints" toward the same subject of the "holiday season."

Plaintiffs' first premise is certainly correct. *Lamb's Chapel* and *Cornelius* prohibit viewpoint discrimination in a nonpublic forum. Plaintiffs' second premise is also correct. Defendants have sought to defeat plaintiffs' motion by emphasizing the religious character of the menorah and by asserting that it commemorates the miraculous story told in the Talmud concerning the tiny amount of oil that burned for eight days upon the rededication of the Temple of Jerusalem. See *Allegheny County,* 492 U.S. at 582–87, 109 S.Ct.

---

5. The Seventh Circuit went on to hold that Chicago's regulations prohibiting any private groups from erecting structures in public areas in the airport were content neutral, but said that if any private groups were allowed to erect structures, the city could not "deny equal access to others because of religious considerations." 917 F.2d at 347 (citing *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)). That portion of *Lubavitch Chabad* treated the airport as a public forum. *Cf. International Society for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992) (airport terminals held nonpublic forums). Relying on this portion of *Lubavitch Chabad,* plaintiffs here argue that, because the Building Au-

thority allows some private groups to erect displays in the lobby of the City–County Building, it may not deny plaintiffs equal access because of "religious considerations." If the lobby of the City–County Building were a public forum, plaintiffs would be correct. See *Doe v. Small,* 964 F.2d 611, 620 (7th Cir.1992) (*en banc*) (explaining that court in *Lubavitch Chabad* was careful to point out that free-standing menorahs could not be excluded from a "public forum" if other free-standing structures were permitted). Because the parties have stipulated for purposes of the pending motion that the lobby is a nonpublic forum, however, that portion of *Lubavitch Chabad* does not apply here.

at 3095–98 (opinion of Blackmun, J.). It is not clear just what legal conclusions the defendants would have the Court draw from the fact that the menorah is a powerful and evocative religious symbol. A precise and thorough exegesis of that symbolism is neither an appropriate task for this Court nor relevant to the legal issues here.

Plaintiffs' third premise is where the issue lies. According to plaintiffs, the Policy on Seasonal Displays both establishes a permitted subject of speech—"seasonal displays"—and then prohibits expression of a group of viewpoints about that subject—religious viewpoints. Both *Lamb's Chapel* and *Cornelius* prohibit "viewpoint" discrimination in a nonpublic forum, but both decisions also permit a government to discriminate on the basis of *subject matter*. The difference between prohibited "viewpoint" discrimination and permitted "subject matter" discrimination is both decisive and, at least in the abstract, rather elusive. A close examination of the factual contexts and reasoning in the nonpublic forum cases is therefore helpful in understanding the difference between subject matter and viewpoint discrimination.

*Lamb's Chapel* involved the after-hours use of a public school building. The school had a rule that allowed "social, civic, or recreational uses" of the building, but provided that the school premises could not be used "by any group for religious purposes." —— U.S. at ——, 113 S.Ct. at 2144. A local church sought permission to use the school to show a film series on family values and child-rearing in which these topics would be addressed from a Christian perspective. Relying on the rule against use "for religious purposes," the school refused. The church sued under the Free Speech Clause and introduced evidence showing that the school facilities had been used by a wide range of other outside groups, including some that dealt with family issues and child-rearing. —— U.S. at —— –—— & n. 5, 113 S.Ct. at 2146–47 & n. 5. A lecture or film about child-rearing and family values would have been acceptable subject matter for a group using the school, but the church's film series was excluded because of the viewpoint that would be expressed.

The Supreme Court had little difficulty in ruling unanimously in favor of the church. The Court treated the school as a nonpublic forum and explained that "control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." —— U.S. at ——, 113 S.Ct. at 2147 (quoting *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451). The Court found that the rule against use of the school "for religious purposes" was unconstitutional as applied because it excluded a religious viewpoint on a subject otherwise permissible in the nonpublic forum: "That all religions and all uses for religious purposes are treated alike under Rule 7, however, does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint." —— U.S. at ——, 113 S.Ct. at 2147. "Although a speaker may be excluded from a non-public forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose special benefit the forum was created . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id.* (quoting *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451).

*Lamb's Chapel* did not find the rule against use for religious purposes to be facially unconstitutional. Instead, the Court was careful to state that the challenged rule was "unconstitutionally applied in this case." —— U.S. at ——, 113 S.Ct. at 2147. Accordingly, the Court did not suggest, for example, that the First Amendment would have required the school to rent its facilities for worship services. In addition, in *Lamb's Chapel* the distinction between permissible subject matter discrimination and prohibited viewpoint discrimination was easy to apply. The Court had no doubt that the school would have allowed use of the facilities for other programs on "child-rearing and family

values," and it was clear that the church had been denied access based solely on the fact that it planned to present a religious "viewpoint" on those issues. Perhaps because the difference between subject matter and viewpoint discrimination was so clear in that case, the opinion does not offer explicit guidance as to how the lower courts should distinguish between permissible subject matter discrimination and prohibited viewpoint discrimination.

*Lamb's Chapel* applied the legal standard articulated in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), for access to a "nonpublic forum." In *Cornelius,* several groups sought to raise funds by participating in the Combined Federal Campaign, a charitable fundraising effort among employees of the federal government. Government policy excluded groups that sought to influence public policy through political activity, advocacy, lobbying, or litigation on behalf of others. The evidence in the case showed that the Combined Federal Campaign had a record of broad access, but there was no evidence that approval for participants was automatic or ministerial. 473 U.S. at 804, 105 S.Ct. at 3450. After finding that the campaign was a "nonpublic forum," the Court stated the standard of access:

> Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

473 U.S. at 806, 105 S.Ct. at 3451 (citations omitted). The government argued in *Cornelius* that it was reasonable to exclude public advocacy groups in order to encourage participation in the campaign, to avoid disruptive controversy, and to avoid "the reality and appearance of Government favoritism or entanglement with particular viewpoints." *Id.* at 807, 105 S.Ct. at 3451. The Court agreed that the policy excluding advocacy groups was reasonable, and it specifically approved the government's interest in avoiding controversy that might disrupt the workplace. 473 U.S. at 809–10, 105 S.Ct. at 3452–53. "Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas." *Id.* at 811, ·105 S.Ct. at 3453.

*Cornelius* recognized, however, that a desire to avoid controversy might "conceal a bias against the viewpoint advanced by the excluded speakers." 473 U.S. at 812, 105 S.Ct. at 3454. Because the issue of such hidden "viewpoint discrimination" had not been decided below, the Court did not decide it but allowed the advocacy groups to pursue that theory on remand. For present purposes, *Cornelius* is most significant for the standard it announced for access to a nonpublic forum and for its recognition that a desire to avoid controversy *may* be a viewpoint neutral basis for excluding certain subjects or groups of speakers from a nonpublic forum.

Plaintiffs also rely on *Hedges v. Wauconda Community Unit School Dist. No. 118,* 9 F.3d 1295 (7th Cir.1993). In *Hedges,* a junior high school policy prohibited students from distributing written material that was obscene, libelous, or "of a religious nature." A student wished to distribute a religious pamphlet outside her school before the school day began. The most pertinent part of the Seventh Circuit's opinion holding that the policy violated the First Amendment reads as follows:

> Like the district court, we believe that the 1990 Policy poses little difficulty. It lumps religious speech with obscenity and libel for outright prohibition in the junior high school. Schools may not prohibit their pupils from expressing ideas. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). And no arm of

government may discriminate against religious speech when speech on other subjects is permitted in the same place at the same time. *Lamb's Chapel v. Center Moriches Union Free School District,* — U.S. —, —, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993); *Doe v. Small,* 964 F.2d 611 (7th Cir.1992) (in banc). See Douglas Laycock, *Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers,* 81 Nw.U.L.Rev. 1, 48 (1986). The first amendment's ban on discriminating against religious speech does not depend on whether the school is a "public forum" and, if so, what kind (subjects to which we return). *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1114 (7th Cir.1986). Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint. *R.A.V. v. St. Paul,* — U.S. —, — – —, 112 S.Ct. 2538, 2543–45, 120 L.Ed.2d 305 (1992). Especially not on account of a religious subject matter, which the free exercise clause of the first amendment singles out for protection.

9 F.3d at 1297–98. This portion of the court's decision apparently did not turn on the category of the forum, but in addressing the school's later, more complex policy on leafletting, the court treated the school as a nonpublic forum, which meant the school "may not adopt unjustified restrictions and may not discriminate against disfavored viewpoints or subjects (such as religion)." 9 F.3d at 1300.

After this excursion into the sources of plaintiffs' theory, we return to application of that theory to the specific facts of this case, and the question whether the Building Authority has discriminated on the basis of subject matter, which is permissible, or viewpoint, which is not. The most sweeping claim for plaintiffs would be that a government may never exclude religious expression from a nonpublic forum. There is language in *Hedges* that might support such a claim. 9 F.3d at 1297, 1300 ("no arm of government may discriminate against religious speech when speech on other subjects is permitted in the same place at the same time"; manag-

er of nonpublic forum "may not discriminate against disfavored viewpoints or subjects (such as religion)"). See also *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1113 (7th Cir.1986) (school could not discriminate "arbitrarily against one type of speech, religious speech," regardless of how forum is categorized). Plaintiffs' reply brief seemed to make this claim, saying the Building Authority policy prohibiting display of religious symbols "cannot survive constitutional challenge if displays on *any* subject are permitted in the lobby." (Emphasis added.) At the hearing, however, plaintiffs said they did not make so sweeping a claim.

Plaintiffs' concession is correct. By virtue of the very definition of a nonpublic forum in cases like *Cornelius* and *Lamb's Chapel,* governments may bar categories or subjects from a nonpublic forum. If the law were otherwise, then the *Lamb's Chapel* Court should have declared the school's policy against use "for religious purposes" to be facially unconstitutional, and the Court should have required the city to display the plaintiff's political advertisements on the city buses in *Lehman v. Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). It did neither, and *Lamb's Chapel* held only that the rule was unconstitutional *as applied* to bar expression of a religious viewpoint on a subject properly included in the forum.

The issue then becomes the narrower question whether the Building Authority has somehow established an "otherwise includible subject" as to which plaintiffs' menorah expresses a viewpoint. Plaintiffs argue the relevant subject matter is "the holiday season." They say the Building Authority allows secular symbols and viewpoints (the Christmas tree) and prohibits religious symbols and viewpoints (plaintiffs' menorah or someone else's Nativity scene or crescent). Plaintiffs base their claim of viewpoint discrimination on three types of evidence here. First, they rely most heavily on the Policy on Seasonal Displays itself. They say the policy on its face both establishes the permissible subject of the holiday season and then imposes viewpoint discrimination by prohibiting religious symbols in holiday season displays. If the policy alone is not enough, plaintiffs

rely second on the Building Authority's past practice of allowing private groups to use the lobby for seasonal displays, and third on the Building Authority's own display of a Christmas tree. Each type of evidence is considered in turn.

The policy states in full: "Religious displays and symbols are not permitted in the City–County Building in that the display of seasonal religious symbols in the halls of government conveys the appearance of governmental endorsement of religion in violation of the Establishment Clause of the First Amendment of the Federal Constitution." The Building Authority tries to save the policy by arguing that it is not a "policy on seasonal displays" but a blanket ban on display of any religious symbols at any time in the public spaces of the City–County Building. Plaintiffs remind the Court of the title of the policy—"Policy on Seasonal Displays in the City–County Building"—and the fact that the contemporaneous documentary record shows that the policy was a direct response to controversy concerning these plaintiffs' prior displays during the holiday season. See *Joint Stipulations of Fact*, Tabs B–H. On this record, two points are clear. First, there is no evidence that the Building Authority has permitted any "non-seasonal" displays of religious symbols in the public spaces of the building. Second, however, the policy was adopted in response to controversy concerning seasonal displays of religious symbols. In the absence of evidence showing the Building Authority might allow non-seasonal displays of religious symbols, the distinction between a blanket prohibition on display of religious symbols and a policy focused on seasonal displays of religious symbols does not make a constitutional difference here. The issues here are deeper than a drafting error in the policy. The Court doubts that plaintiffs would drop their constitutional claims if the Building Authority were to rewrite its policy as a blanket prohibition on display of religious symbols in the public space of the building.

■ Plaintiffs invite the Court to find the Policy on Seasonal Displays unconstitutional on its face as discriminating between secular and religious symbols. Based on *Lamb's Chapel*, the Court declines to do so. As noted, in *Lamb's Chapel*, the school had a rule that barred use of the building "for religious purposes." —— U.S. at ——, 113 S.Ct. at 2144. That broad prohibition resembles the "Policy on Seasonal Displays" in this case. In *Lamb's Chapel*, the Supreme Court did not find the rule unconstitutional on its face. Instead, the Court held that the rule "was unconstitutionally applied in this case." —— U.S. at ——, 113 S.Ct. at 2147. It was unconstitutionally applied because it was invoked to bar a film series on a subject matter that was otherwise clearly permissible—family values and child-rearing—solely because of the religious viewpoint that would be expressed in the film series.

Accordingly, this case calls for a similar analysis of the Building Authority's policy as applied here. It is not difficult to imagine possible applications of the policy that would likely be unconstitutional, much like the facts in *Lamb's Chapel*.[6] This Court will decide this case based on the facts in the record, and not on speculative possibilities about what might happen in different circumstances. The issue, then, is whether the Building Authority has engaged in viewpoint discrimination, in violation of the Free Speech Clause, by applying its policy to prohibit plaintiffs' display of a Chanukah menorah.

There is no evidence in this record that the Building Authority has permitted private displays expressing "secular viewpoints" on the holiday season since it adopted the challenged policy. The parties have submitted records showing more than a hundred re-

6. For example, the record shows the Building Authority here has permitted displays celebrating Black History Month and Hispanic Heritage Month. *Joint Stipulations of Fact*, Tab A. In displays on those "otherwise includible subjects," the Building Authority could not invoke its policy on religious symbols to prohibit displays using religious symbols and focusing on the religious dimensions of African American history or Hispanic culture. Such a prohibition would fall squarely within the reasoning of *Lamb's Chapel*. However, there is no indication here that the Building Authority would actually construe and apply its policy to prohibit such displays.

quests to use the lobby between 1990 and September 22, 1994. Nearly all of the requests were granted. However, the records show a drop in the volume and variety of permitted uses of the lobby after the policy was adopted. The Building Authority also began to deny requests for sales and fundraising efforts, including, for example, requests by the Girl Scouts, the Retired Senior Volunteer Program, and the Downtown Muscular Dystrophy Association.

▮ Concerning the "holiday season," the records show that plaintiffs were permitted to display their menorah in past years, and that the Commission for Downtown sold Christmas ornaments in the lobby in 1991. The records also show that in 1993 the Building Authority allowed the Indianapolis Department of Parks and Recreation to display in the lobby the winning designs from a "Holiday Greeting Card Design Contest" among elementary and junior high students. *Joint Stipulations of Fact,* Tab A. The request apparently was approved long before the Building Authority adopted its policy, and the record provides no additional details about the display that might support a claim that it shows the Building Authority allowed displays of "secular viewpoints" on "the holiday season."

Since the policy was adopted, the records do not reflect any private "secular" displays expressing "secular viewpoints" on the holiday season. The Court is not entirely sure what such a display might be, let alone whether such a hypothetical display would be permitted by the Building Authority. Perhaps the Chamber of Commerce or some other groups might like to promote sales of holiday gifts, or encourage families to gather for the holidays, or encourage charitable giving during the holiday season. Perhaps plaintiffs would view such displays as expressing secular viewpoints on the holiday season. There is no indication in this record, however, that anyone wants to put up such displays, or that the Building Authority would permit them under its current practices.[7]

Even if such hypothetical displays might be allowed under the Building Authority policy, this Court does not believe the record in this case shows that the Building Authority has opened up the lobby for what *Lamb's Chapel* would recognize as secular "viewpoints" on the "subject" of "the holiday season." In *Lamb's Chapel,* as noted, the difference between prohibited viewpoint discrimination and permissible subject matter discrimination was easy to apply. In other cases, however, that critical difference might appear to create opportunities for facile manipulation of the concepts. Some commentators have noted the issue.[8] By identifying a sufficiently broad or narrow "subject," it might be possible to dictate the answer to whether a particular exclusion is based on subject matter or viewpoint.

---

7. The Policy on Seasonal Displays may be the only formal written policy on displays in the lobby, but it does not attempt to codify all the standards on subject matter, time, space, taste, or other subjects that the Building Authority would surely apply if presented with new problems. Although the law in this area is complex, this lack of detailed policies is not surprising: "It would hardly occur to the average school administrator to think that when he allowed the girl scouts to use school premises he should be thinking what to do when the Ku Klux Klan asked to use those premises for its cookie sale, on penalty of having to pay damages if he thought wrong." *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d at 1117.

8. See Rosemary C. Salomone, *Public Forum Doctrine and the Perils of Categorical Thinking: Lessons from Lamb's Chapel,* 24 N.M.L.Rev. 1 (1994) (text accompanying notes 73–75) (in nonpublic forum, "content-based" discrimination is permissible, "viewpoint" discrimination is not; "unclear under which rubric a blanket prohibition against religious speech would lie"); Carolyn Wiggin, Note, *A Funny Thing Happens When You Pay For A Forum: Mandatory Student Fees to Support Political Speech at Public Universities,* 103 Yale L.J. 2009, 2033 (1994) (*Lamb's Chapel* "treatment of 'religious' as point of view suggests that categories of speech that might once have been considered subject matter- or content-based may now be considered viewpoint-based"). For an interesting example of the problems that might be spawned, see Michael R. O'Neill, *Government's Denigration of Religion: Is God the Victim of Discrimination in Our Public Schools?,* 21 Pepp.L.Rev. 477 (1994) (part VII of the article), arguing schools that teach the scientific theory of evolution are now required to permit discussion/teaching of creationism. *But cf. Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Establishment Clause prohibits teaching of creationism).

Many illustrations are possible, but suppose a group that combats drunk driving sets up a public information display during the holiday season built around the theme "Celebrate Sober" or the like. Is the relevant subject for these purposes drunk driving, the holiday season, driving in the holiday season, or all of those? Yet it stretches both language and *Lamb's Chapel* beyond recognition to say that such a display would express a "secular viewpoint" on "the holiday season" such that the lobby would thereby become available for anyone to display religious symbols to express a viewpoint on "the holiday season."

With the very limited factual showing of uses of the lobby even arguably tied to "the holiday season," the Court is not persuaded the Building Authority has taken any actions that amount to recognizing "the holiday season" as a meaningful category or subject matter for speech and expression of competing "viewpoints" in this nonpublic forum. And without a relevant track record of actual "holiday" uses after the Building Authority adopted its policy in 1993, "the holiday season" is, in the abstract, too broad and too amorphous to be treated as a "subject" for purposes of this analysis.[9]

The Building Authority's practices and policies toward the lobby in this case simply do not bear enough of a resemblance to those in *Lamb's Chapel* for this Court to treat exclusion of seasonal religious symbols as a denial of "access to a speaker solely to suppress the point· of view he espouses on an otherwise includible subject." —— U.S. at ——, 113 S.Ct. at 2147 (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451). That prohibition on viewpoint discrimination in a nonpublic forum set forth in *Cornelius* and *Lamb's Chapel* was not intended to erase the distinctions between a nonpublic forum and the traditional public forum at the opposite end of the legal spectrum. Rather, the prohibition on viewpoint discrimination was included to prevent the government from manipulating access to the forum so as to suppress disfavored speakers. That was certainly the concern in *Cornelius,* where public advocacy groups felt they were being excluded from the fundraising forum because of the views they advocated. While allowing the advocacy groups to pursue that theory on remand, the Supreme Court nevertheless held that a reasonable desire to avoid controversy could justify exclusion of the entire set of advocacy groups. 473 U.S. at 809–11, 105 S.Ct. at 3452–54 (In *Lamb's Chapel,* of course, it was very clear that the church would have been permitted to show its films on family values and child-rearing but for the specific views being expressed.) The Building Authority's decision to avoid the controversy provoked by displays of religious symbols is not a comparable effort to suppress a point of view. See also *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d at 1109 (government's desire to avoid potentially disruptive controversy and to maintain appearance of neutrality can be sufficient justification for viewpoint-neutral exclusion of subject matter from nonpublic forum).

The status of nonpublic forums in the analytic framework for access to forums also counsels against easy expansion of "subjects." In that framework, a nonpublic forum is the type the government controls most tightly, and the government probably retains the right to close it entirely. See

---

9. "But to call Christmas a religious holiday is to miss an important point. There *is* a Christian holy day by that name, and celebrated on the same date, to commemorate the Nativity of Jesus Christ. But that holy day bears little connection to the secular Christmas holiday that nearly all Americans observe. The Christian holy day of Christmas has nothing to do with trees or wreaths or Santa or reindeer; indeed, some Christians believe that telling children that a flying sleigh will land on the roof smacks of paganism. The secular holiday is celebrated, it sometimes seems, principally for the benefit of the retail trade, which often records half its annual sales during the Christmas season. True, there would be no secular Christmas holiday had there never been a religious Christmas holiday, but that is a non sequitur. There would be no two-day weekends of rest (including the closure of public schools, government buildings, and many private offices) without the religious sabbath traditions that started them; that does not mean that the weekends 'celebrate' (or even 'observe') those religious sabbaths. If the government can celebrate the secular Christmas holiday, it can put up trees or wreaths, neither of which involves *religious* observance." Stephen L. Carter, Comment, *The Resurrection of Religious Freedom?,* 107 Harv.L.Rev. 118, 135 (1993) (footnotes omitted, emphasis in original).

*Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983) ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity"); *May,* 787 F.2d at 1113 (in nonpublic forum, government's authority to prevent public expression of ideas and opinions is "almost complete and fails only when the government tries to suppress a particular point of view"). It would be contrary to the purpose of the law in this area of the First Amendment to discourage governments from creating limited public forums or nonpublic forums by imposing on those who do the broad obligations of access that plaintiffs seek here. When a case of clear viewpoint discrimination comes along, of course, as in *Lamb's Chapel,* courts should not hesitate to act. But the Building Authority decisions about access to the lobby in this record do not show "the holiday season" to be a subject for which the Building Authority has opened the lobby for private expressions of various secular and religious viewpoints.

▇ Does the Building Authority's own display of a Christmas tree establish viewpoint discrimination? After adopting its new policy in 1993, the Building Authority interpreted the policy as even barring its own Christmas tree. After employees complained, however, the Building Authority board sought advice from its counsel, who pointed out that the courts had deemed Christmas trees to be secular symbols rather than religious ones. *Joint Stipulations of Fact,* Tab D. Under the decisions of the Supreme Court and the Seventh Circuit, this point seems to be established as a matter of constitutional fact. See *Lubavitch Chabad,* 917 F.2d at 343 (contrary argument "borders on the frivolous in view of current law"). Plaintiffs argue here, however, that if the Building Authority displays a secular holiday symbol like a Christmas tree, the refusal to allow religious holiday symbols amounts to viewpoint discrimination under *Lamb's Chapel.*

For several reasons, this Court is not persuaded that the logic of *Lamb's Chapel* applies to the display of holiday symbols in a nonpublic forum. First, as just discussed, "the holiday season" is too broad and too amorphous a subject, at least on this record, to serve as a "subject" against which "viewpoint discrimination" can be measured for purposes of *Lamb's Chapel.*

Second, at all levels of the federal courts, the constitutional case law on the display of religious holiday symbols is extensive and detailed. New factual twists seem to arise each year. If *Lamb's Chapel* applies here, then every time a government puts up a Christmas tree (or perhaps a wreath or some evergreen branches) in a "nonpublic forum," that government has extended an open invitation to all interested private parties to display the religious symbols of their choice in the same area. As a practical matter, that result would be dramatic. As a legal matter, it would seem to erase, for purposes involving display of seasonal religious symbols, the differences between a nonpublic forum and public forums like parks, streets, and sidewalks. While it is possible the Supreme Court intended its logic in *Lamb's Chapel* to reach so far, this Court does not believe it would have reached into this frequently litigated area without expressing either its intention or its recognition of those consequences. At least in hindsight, *Lamb's Chapel* appears to have been an easy case in which the viewpoint discrimination was evident, and the Court did not need to address the outer limits of its reasoning, especially in situations where the difference between "subject matter" discrimination and "viewpoint" discrimination would be more problematic. This Court believes plaintiffs are trying to stretch *Lamb's Chapel* to reach a factual context it was not intended to reach.

Instead, *Lubavitch Chabad House v. Chicago* is essentially on all fours factually and controls in this nearly identical factual context. As described above, the city put up Christmas trees at the airport, and plaintiffs wanted the right to display a menorah at the same place. The Seventh Circuit held that the city could choose either to allow such display of religious symbols, or to prohibit them. 917 F.2d at 345. Similarly here, the city puts up a Christmas tree in the lobby,

and plaintiffs want to display a menorah there, too.[10]

Third, *Lamb's Chapel* held that where the school would allow some private groups access to the school facilities for programs on the chosen subject, it could not refuse to allow another private group to hold a program with a different viewpoint on the same subject. All the uses at issue in *Lamb's Chapel* were by private groups, not the school itself. By contrast here, it is the Building Authority itself that is erecting and displaying the Christmas tree. The difference is significant. Consider one example from the Building Authority's past use of the lobby here. The Indianapolis Police Department has used the lobby for a "Say No to Drugs" program. *Joint Stipulations of Fact*, Tab A. That program expresses a "viewpoint" on the "subject" of drugs, but this Court doubts that the First Amendment, at least in this nonpublic forum, gives a private group the right to insist on setting up an adjoining display in the lobby advocating the legalization of marijuana or other controlled substances. Similarly here, the Building Authority can put up its own Christmas tree without opening up the nonpublic forum to any private groups that might want to display menorahs, crosses, Nativity scenes, crescents, totem poles, and/or Buddhas.

The act of setting up a Christmas tree is not the kind of intentional act that opens up a forum as wide as plaintiffs here demand. In its cases dealing with forums other than traditional public forums, the Supreme Court has recognized that its jurisprudence could actually create disincentives for governments to create any new government-controlled forums for private expression. See, *e.g.*, *United States v. Kokinda*, 497 U.S. 720, 733, 110 S.Ct. 3115, 3123, 111 L.Ed.2d 571 (1990) (plurality opinion) ("it is anomalous that the Service's allowance of some avenues of speech would be relied upon as evidence that it is impermissibly suppressing other speech. If anything, the Service's generous accommodation of some types of speech testifies to its

willingness to provide as broad a forum as possible, consistent with its postal mission. The dissent would create, in the name of the First Amendment, a disincentive for the Government to dedicate its property to any speech activities at all."). See also *May*, 787 F.2d at 1109 (desire to avoid potentially disruptive controversy and to maintain appearance of neutrality could justify viewpoint-neutral exclusion of speakers from nonpublic forum). When a government establishes a created or limited public forum, it may not appreciate the broad range of speakers and subjects it may have invited. Compare *Congregation Lubavitch v. Cincinnati*, 923 F.2d 458 (6th Cir.1991) (plaintiffs entitled to place menorah in public square during Chanukah), with *Pinette v. Capitol Square Review and Advisory Board*, 30 F.3d 675 (6th Cir.1994) (Ku Klux Klan entitled to erect Latin cross in public square across from state capitol building). While these consequences reflect settled law in traditional public forums, it would be a significant expansion of that law if it were extended, as plaintiffs seek here, to nonpublic forums like the lobby of the City–County Building.

■ The First Amendment does not force the Building Authority to choose each December between putting up no decorations at all, even purely secular ones, and opening up the lobby to any private group that wants to display any variety of religious symbols.

### The Establishment Clause Defense

The Building Authority offers the Establishment Clause as an alternative reason for denying plaintiffs' motion for preliminary injunction. The Court denies plaintiffs' motion under the Free Speech Clause, and it is therefore not logically necessary to reach the Establishment Clause defense. However, it may serve purposes of judicial economy to address this alternative ground at this time.

■ From 1985 through 1992, the Building Authority allowed plaintiffs to put up exactly the same menorah display that plaintiffs want to put up in 1994. In opposing plain-

---

**10.** Plaintiffs claim that a later portion of *Lubavitch Chabad* requires that if any private displays on any subject are allowed, their menorah dis-

play must also be allowed. For the reasons set forth above in note 5, plaintiffs are not correct.

tiffs' request, the Building Authority now argues that, regardless of the dictates of the Free Speech Clause, it would violate the Establishment Clause if it allowed display of the menorah. According to the Building Authority, the Establishment Clause effectively trumps the Free Speech Clause. Without trying to resolve the abstract question of which clause in the First Amendment should take priority in the event of a conflict, the Court finds that under prevailing Establishment Clause jurisprudence, the record does not show that the proposed display would violate the Establishment Clause.

Plaintiffs argue here that the government may allow private displays of religious symbols on public property under a policy of neutrality and equal access. They rely on *Lamb's Chapel*, where the Supreme Court rejected a similar Establishment Clause defense. The Court relied on the fact that the film series would occur outside normal school hours and would be open to the public, and the school's practice of allowing a wide variety of private organizations to use school facilities would eliminate any possible impression that the school was endorsing the church. —— U.S. at ——, 113 S.Ct. at 2148 (following *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)).

In *Widmar v. Vincent*, the Supreme Court held that allowing religious discussions and religious worship in an open forum on a university campus did not run afoul of the Establishment Clause, even though the religious speakers would obtain a benefit from access to the forum. *Id.* at 274–75, 102 S.Ct. at 276–77. This "equal access" or neutrality principle applied in *Widmar* was also followed in *Westside Community Board of Education v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). In finding that the Establishment Clause did not forbid a public secondary school from allowing the formation of a student Christian club that would have the same privileges as other extra-curricular organizations, the plurality stated "the message is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neu-

trality but hostility toward religion." *Id.* at 248, 110 S.Ct. at 2371.

"Cases such as *Lamb's Chapel, Mergens,* and *Widmar* show that neutrality avoids problems under the establishment clause." *Hedges,* 9 F.3d at 1299. See also *Sherman v. Community Consolidated School District 21,* 8 F.3d 1160, 1165 (7th Cir.1993) (Establishment Clause not violated where school applied an "even-handed treatment of religious and nonreligious youth groups"); *Good News/Good Sports Club v. School District of City of Ladue,* 28 F.3d 1501, 1508 (8th Cir. 1994) ("providing a neutral forum for the exchange of ideas" does not violate Establishment Clause).

Turning to cases involving holiday displays of religious symbols, in *Allegheny County v. Greater Pittsburgh ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Court held that a creche displayed during the holiday season on the Grand Staircase at the county courthouse violated the Establishment Clause, *id.* at 601–02, 109 S.Ct. at 3105–06, but that a display of a menorah and a Christmas tree together in front of the building did not, *id.* at 620–21, 109 S.Ct. at 3115–16. The shifting majorities in *Allegheny County* show that such displays must be examined carefully in their overall contexts. See *id.* at 620, 109 S.Ct. at 3115 (opinion of Blackmun, J.). See also *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) (holding that display of creche in context of many secular seasonal symbols did not imply government's endorsement of religious message).

Despite the Building Authority's apparent confession that it was violating the Establishment Clause for years by allowing plaintiffs' display, it appears that under the equal access and neutrality analysis in *Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2148, and *Widmar,* 454 U.S. at 274, 102 S.Ct. at 276, the Supreme Court would probably find little danger that reasonable onlookers would think the menorah was being displayed with the government's endorsement of any religious message. See also *Hedges,* 9 F.3d at 1299 (government should remedy potential Establishment Clause problems by disclaimer of endorsement to declare neutrality).

*Accord, Doe v. Small,* 964 F.2d 611, 621 (7th Cir.1992) (*en banc* ) (placing onus on government to disclaim association with religious speech so as to avoid violating the Establishment Clause).

Nevertheless, the Building Authority's concerns about violating the Establishment Clause (or bearing the expense of litigating the question) are not unreasonable. Even an articulated policy of neutrality might not be a sufficient safeguard in all cases. As Judge Cudahy pointed out in *Doe v. Small,* "a private religious group may so dominate a public forum that a formal policy of equal access degenerates into endorsement." 964 F.2d at 625 (Cudahy, J., concurring in the judgment) (citing *Widmar,* 454 U.S. at 275, 102 S.Ct. at 277). And no one who has followed the law on displays of religious symbols on public property would suggest there are havens so safe and so obvious as to avoid expensive and controversial litigation. Where context is so important, see *Allegheny County,* simple rules of thumb are not likely to be too reliable. Therefore it is quite understandable that managers of public property might wish to steer well clear of this legal maze. Nevertheless, the Building Authority has not presented evidence that would support a finding that plaintiffs' display would so dominate the lobby that a formal policy of equal access and neutrality would be likely to "degenerate into endorsement." The Establishment Clause is not a sufficient basis for denying plaintiffs' motion for preliminary injunction.

### Conclusion

Based on the record before the Court, the Building Authority is not engaging in viewpoint discrimination when it applies its policy to refuse plaintiffs permission to display their menorah in the lobby of the City–County Building. The Free Speech Clause does not require the Building Authority to allow plaintiffs to display their menorah, nor does the Establishment Clause prohibit the Building Authority from allowing them to do so. The First Amendment leaves the Building Authority's manager and board at least that much room to exercise their judgment over appropriate uses of the public property that has been entrusted to them. Accordingly,

plaintiffs' motion for preliminary injunction is DENIED.

So ordered.