63 F.3d 581
 Rabbi Abraham GROSSBAUM and Lubavitch of Indiana,
Incorporated, Plaintiffs-Appellants,
v.
INDIANAPOLIS-MARION COUNTY BUILDING AUTHORITY and Ronald L.
Reinking, in his capacity as General Manager,
Defendants-Appellees.
 No. 94-3730.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 19, 1995.
Decided Aug. 15, 1995.
 
 Nathan Lewin, Niki Kuckes (argued), David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, DC, B. Keith Shake, Henderson, Daily, Withrow & Devoe, Indianapolis, IN, for plaintiffs-appellants Abraham Grossbaum, Rabbi, Lubavitch of Indiana, Inc.
 Thomas J. Costakis (argued), Kevin W. Petz, Krieg, Devault, Alexander & Capehart, Indianapolis, IN, for defendants-appellees Indianapolis-Marion County Bldg. Authority, Ronald L. Reinking, in his capacity as Gen. Manager.
 Before RIPPLE, MANION and ROVNER, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 For many years the plaintiffs, Rabbi Abraham Grossbaum and Lubavitch of Indiana, Inc., had received annual permission to display a menorah in the lobby of the City-County Building in Indianapolis during the eight days of Chanukah. In 1993, the defendant Indianapolis-Marion County Building Authority ("Building Authority") changed its policy and denied permission for the display. In 1994, following a second refusal to permit the menorah display, the plaintiffs sought injunctive and declaratory relief against the Building Authority and Ronald L. Reinking, its general manager. The district court, acting without the benefit of the Supreme Court's recent guidance in this area, denied the plaintiffs' motion for preliminary injunction. The plaintiffs then timely appealed that decision to this court pursuant to 28 U.S.C. Sec. 1292(a)(1). For the reasons presented in the following opinion, we reverse the judgment of the district court.
 
 
 2
 * A. Facts[1]
 
 
 3
 The City-County Building in downtown Indianapolis is the seat of government for the City of Indianapolis and the County of Marion, Indiana. It is administered by the defendant Building Authority, a municipal corporation. The tenants of the building include many of the offices, agencies and departments of the City and County. The lobby of the building is open to the public during business hours. Mr. Reinking, General Manager of the Building Authority that manages the City-County Building, is responsible for granting or denying requests to use lobby space in the building.
 
 
 4
 The lobby of the City-County Building is a site where, by policy and longstanding practice, the Building Authority has allowed broad access to a wide variety of public and private speakers. Requests to use the lobby and to place displays or exhibits in the lobby are usually made in writing, addressed to the Building Authority. However, numerous oral requests have been made and granted as well. Of the 117 written requests made from 1990 through September 22, 1994, all were granted, to public and private groups alike, except several requests for sales or fundraising activities, one request for third-time use by the same party, and, in 1993 and 1994, the plaintiffs' requests to display their menorah at Chanukah.[2]
 
 
 5
 Rabbi Grossbaum, an Orthodox Jewish Rabbi, and Lubavitch of Indiana, Inc., an Orthodox Jewish Organization ("Lubavitch"), were granted permission from the Building Authority, through Mr. Reinking, to erect their five-foot wooden menorah in the lobby of the City-County Building throughout Chanukah each year from approximately 1985 through 1992.[3] Their menorah display was accompanied by a sign stating "Lubavitch wishes you a Happy Chanukah," and plaintiffs were permitted to light the candles.
 
 
 6
 During Chanukah 1992, the Building Authority received complaints that the display of the menorah in the City-County Building violated the Establishment Clause of the Constitution. Thereafter, at its October 4, 1993 meeting, the Building Authority considered and unanimously adopted a "Policy on Seasonal Displays," which stated:
 
 
 7
 Religious displays and symbols are not permitted in the City-County Building in that the display of seasonal religious symbols in the halls of government conveys the appearance of governmental endorsement of religion in violation of the Establishment Clause of the First Amendment of the Federal Constitution.
 
 
 8
 At first the Building Authority prohibited both the menorah and the Christmas tree in its lobby. However, once it was informed by counsel that courts treat a Christmas tree as a secular, rather than religious, symbol, the Building Authority Board decided in its December 1, 1993 meeting that a Christmas tree in the lobby was consistent with, rather than in violation of, its Policy. It erected a Christmas tree in the lobby, but continued to prohibit display of the menorah on the ground that its Policy on Seasonal Displays forbade religious displays and symbols in the lobby.
 
 
 9
 Lubavitch did not pursue its efforts to present its display in 1993. In 1994, however, after it again was denied permission to display its menorah on the same ground, the plaintiffs filed a complaint, seeking declaratory and injunctive relief, against the Building Authority and Mr. Reinking in his official capacity. The complaint contained four counts: two free speech claims, alleging viewpoint-based and content-based discrimination against religious speech, an equal protection claim and a free exercise of religion claim. The complaint alleged that, because Lubavitch wanted to erect a menorah during Chanukah 1994 and in future years, the Building Authority's denial of that request to display a menorah constituted a continuing injury. Lubavitch also moved for a temporary restraining order or preliminary injunction as to count I only, the religious discrimination allegation based on viewpoint discrimination.
 
 B. District Court Decision
 
 10
 The district court denied plaintiffs' motion for a preliminary injunction on November 22, 1994. See Grossbaum v. Indianapolis-Marion County Bldg. Auth., 870 F.Supp. 1450 (S.D.Ind.1994). Its evaluation of the preliminary injunction focused on the plaintiffs' reasonable likelihood of success on the merits. The point of disagreement was clearly defined: The plaintiffs alleged that the Building Authority's Policy on Seasonal Displays, which excluded seasonal religious symbols from its lobby, amounted to viewpoint discrimination. In the Building Authority's view, religion was a subject, not a viewpoint.
 
 
 11
 Because the parties had stipulated, for the purposes of this litigation, that the lobby was a "nonpublic forum," the district court followed the analysis for evaluating access to nonpublic forums under the Free Speech Clause set forth in Lamb's Chapel v. Center Moriches Union Free School District, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Under that approach, discrimination on the basis of subject matter was permissible, but discrimination on the basis of viewpoint was not. The district court determined that the Building Authority had not established a "subject," namely the "holiday season," as to which plaintiffs' menorah expressed a "religious viewpoint." The court was not persuaded by the plaintiffs' position that the Building Authority allowed secular symbols and viewpoints, such as the Christmas tree, on the subject of the "holiday season" but prohibited religious symbols and viewpoints, such as plaintiffs' menorah, on the same subject. Nor did the court believe that the Building Authority's Policy barring seasonal displays "for religious purposes" had been unconstitutionally applied to prohibit the plaintiffs' display. According to the court, the record did not show that the Building Authority, since it had adopted the challenged Policy, had permitted private displays expressing "secular viewpoints" on the holiday season. The court then stated:
 
 
 12
 With the very limited factual showing of uses of the lobby even arguably tied to "the holiday season," the Court is not persuaded the Building Authority has taken any actions that amount to recognizing "the holiday season" as a meaningful category or subject matter for speech and expression of competing "viewpoints" in this nonpublic forum. And without a relevant track record of actual "holiday" uses after the Building Authority adopted its policy in 1993, "the holiday season" is, in the abstract, too broad and too amorphous to be treated as a "subject" for purposes of this analysis.
 
 
 13
 870 F.Supp. at 1461.
 
 
 14
 In the district court's view, the viewpoint discrimination forbidden in Lamb's Chapel had not occurred here. Instead of suppressing a point of view, the court opined, the Building Authority had decided to avoid the controversy that might be provoked by displays of religious symbols. The court concluded that "the Building Authority decisions about access to the lobby in this record do not show 'the holiday season' to be a subject for which the Building Authority has opened the lobby for private expressions of various secular and religious viewpoints." Id. at 1462.
 
 
 15
 Nevertheless, the district court approved the Building Authority's display of a Christmas tree as a secular display that did not establish viewpoint discrimination under this circuit's decision in Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341 (7th Cir.1990). In fact, the court pronounced Lubavitch Chabad, rather than Lamb's Chapel, to be a case "on all fours factually and control[ling] in this nearly identical factual context." Id. Lubavitch Chabad upheld the decision by the City of Chicago to put a Christmas tree, a secular symbol, in the O'Hare Airport and, at the same time, to exclude private displays of religious symbols; this court held that such refusal did not amount to religious discrimination or an equal protection violation. The district court concluded: "The First Amendment does not force the Building Authority to choose each December between putting up no decorations at all, even purely secular ones, and opening up the lobby to any private group that wants to display any variety of religious symbols." 870 F.Supp. at 1463.
 
 
 16
 Although it was not necessary in light of its earlier analysis, the district court next addressed the Building Authority's Establishment Clause defense. It determined that "the record does not show that the proposed display would violate the Establishment Clause." Id. at 1464. The district court invoked the "equal access" or neutrality analysis of Supreme Court case law and concluded that the Building Authority did not appear to endorse the religious message of the menorah, and thus was probably not violating the Establishment Clause during the years it allowed the display of the menorah. The court also found that the Building Authority did not offer evidence that the menorah would dominate the lobby and thereby create an appearance of endorsement. It concluded that, had it been required to reach the issue of endorsement, this Establishment Clause concern would not have constituted a sufficient basis for denying a preliminary injunction.
 
 
 17
 The district court's denial of the motion for preliminary injunction concluded:
 
 
 18
 Based on the record before the court, the Building Authority is not engaging in viewpoint discrimination when it applies its policy to refuse plaintiffs permission to display their menorah in the lobby of the City-County Building. The Free Speech Clause does not require the Building Authority to allow plaintiffs to display their menorah, nor does the Establishment Clause prohibit the Building Authority from allowing them to do so. The First Amendment leaves the Building Authority's manager and board at least that much room to exercise their judgment over appropriate uses of the public property that has been entrusted to them.
 
 
 19
 870 F.Supp. at 1465. This appeal was timely filed.[4]
 
 II
 DISCUSSION
 A. Review of Preliminary Injunction
 
 20
 When we review a district court's preliminary injunction decision, we accord substantial deference to that court's discretionary acts of weighing evidence and balancing equitable factors. However, our consideration of that court's legal conclusions is a de novo review. Gateway E. Ry. v. Terminal R.R. Ass'n, 35 F.3d 1134, 1137 (7th Cir.1994) (citing United States v. Baxter Healthcare Corp., 901 F.2d 1401, 1407 (7th Cir.1990)). The party seeking a preliminary injunction has the burden of establishing four factors:
 
 
 21
 A district court typically considers whether the moving party has demonstrated (1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant clears these two thresholds, the court must consider (3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties.
 
 
 22
 Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1067 (7th Cir.1994) (citing Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir.1992); Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1433 (7th Cir.1986); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386-88 (7th Cir.1984)); see Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 608 (7th Cir.1993).
 
 
 23
 The central issue in this appeal is whether the district court erred in denying a preliminary injunction on the ground that Lubavitch was not likely to succeed on the merits of its case. Although the parties do not discuss them, the other three factors are clearly present. It seems indisputable that both the movants and nonmovants could suffer irreparable harm in this case: The plaintiffs would be injured if the denial of the menorah display was an unconstitutional violation of their freedom of expression. The defendants would be harmed if their Establishment Clause justification for denying the display was determined to be unconstitutional. Moreover, it is surely in the public interest to decide whether the Building Authority's refusal to display the menorah is viewpoint-based discrimination, or whether the Building Authority's defense under the Establishment Clause allows the exclusion of the menorah. For this reason we turn, as did the district court, to the question whether the plaintiffs are likely to succeed on the merits of their claims.[5]
 
 B. The Free Speech Claim
 
 24
 Rabbi Grossbaum and Lubavitch claim that the Building Authority's adoption and application of a policy forbidding religious holiday displays and symbols excludes their menorah from the lobby of the City-County Building solely because of the religious content, nature and/or viewpoint expressed by the display. They further maintain that such a denial is an unconstitutional exclusion of speech protected by the First Amendment.[6]
 
 
 25
 Two factors relevant to our analysis are undisputed. The first is that the menorah is a privately owned religious symbol. It is well established that the display of such symbols as a menorah, a cross, or a creche is symbolic religious speech protected by the First Amendment. Capitol Square Review & Advisory Bd. v. Pinette, --- U.S. ----, ----, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995) (stating that Supreme Court precedent establishes that the Ku Klux Klan's display of a cross is private religious expression that "is as fully protected under the Free Speech Clause as secular private expression").[7] The second factor upon which the parties agree is that the lobby of the City-County building is a nonpublic forum. We therefore turn now to whether the government defendants in this case can exclude such protected speech from its nonpublic forum.
 
 1.
 The Nonpublic Forum
 
 26
 Constitutionally protected religious expression is not guaranteed unlimited access to government property. The Supreme Court's approach for deciding when the government's limitations on the use of its property outweigh the interest of private parties wishing to use the property for other purposes is termed "forum analysis." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). "The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." Capitol Square, --- U.S. at ----, 115 S.Ct. at 2446 (citing Cornelius, 473 U.S. at 802-03, 105 S.Ct. at 3449). Cornelius has most succinctly defined and differentiated the three types of forums. The first is the "traditional public forum," which is a place that " 'by long tradition or by government fiat [has] been devoted to assembly and debate.' " 473 U.S. at 802, 105 S.Ct. at 3449 (quoting Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). The second, a limited or designated public forum, is one "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for discussion of certain subjects." Id. The third and last forum is the nonpublic one which the government "may reserve ... for its intended purposes," Perry, 460 U.S. at 46, 103 S.Ct. at 955, and over which it has the right to exercise control concerning access. Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451; see also International Soc'y for Krishna Consciousness, Inc. v. Lee, --- U.S. ----, ---- - ----, 112 S.Ct. 2701, 2705-06, 120 L.Ed.2d 541 (1992).[8]
 
 
 27
 "[T]he extent to which the Government can control access depends on the nature of the relevant forum." Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448. Restrictions to access of a public forum must be minimal, because the purpose of that forum is "the free exchange of ideas." For that reason "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." Id. The same test is applied to designated forums: "[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling state interest." Id. However, access to nonpublic forums is governed by a different standard: It "can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.' " Id. (quoting Perry, 460 U.S. at 46, 103 S.Ct. at 955).
 
 
 28
 With respect to public property that is not a designated public forum open for indiscriminate public use for communicative purposes, we have said that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."
 
 
 29
 Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147 (quoting Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451, citing in turn Perry Education Ass'n, 460 U.S. at 49, 103 S.Ct. at 957). Thus, in a nonpublic forum, the government may control access, restricting identifiable subjects or speakers, if the two criteria of reasonableness and viewpoint neutrality are met. Concerning the "reasonableness" prong, Cornelius has made clear that the government's "decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." 473 U.S. at 808, 105 S.Ct. at 3452 (citing cases). In a nonpublic forum, an evaluation of the reasonableness of the restriction of access "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." Id. at 809, 105 S.Ct. at 3452.
 
 
 30
 Concerning the "viewpoint neutrality" prong, Cornelius stated the rule for a nonpublic forum as well:
 
 
 31
 [T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.
 
 
 32
 Id. at 806, 105 S.Ct. at 3451. Subsequent Supreme Court decisions have followed this analysis. See Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2147 (holding unconstitutional a rule excluding all religious speech as viewpoint discrimination); R.A.V. v. City of St. Paul, 505 U.S. 377, 390-93, 112 S.Ct. 2538, 2547-48, 120 L.Ed.2d 305 (1992) (striking down as unconstitutional a criminal statute that amounted to viewpoint discrimination). Our circuit has also applied these principles when announcing that "no arm of government may discriminate against religious speech when speech on other subjects is permitted in the same place at the same time." Hedges v. Wauconda Community Unit School Dist. No. 118, 9 F.3d 1295, 1297 (7th Cir.1993):
 
 
 33
 The first amendment's ban on discriminating against religious speech does not depend on whether the school is a "public forum" and, if so, what kind.... Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint. Especially not on account of a religious subject matter, which the free exercise clause of the first amendment singles out for protection.
 
 
 34
 Id. at 1298 (citations omitted) (holding that school policy prohibiting written material of a religious nature violates the first amendment); see Air Line Pilots Ass'n, Int'l v. Department of Aviation, 45 F.3d 1144, 1159 (7th Cir.1995) (noting that proper focus of viewpoint inquiry is one which "examines whether the proposed speech dealt with a subject that was 'otherwise permissible' in a given forum").
 
 2.
 Viewpoint Discrimination
 
 35
 The plaintiffs' position is that exclusion of their menorah display from the City-County Building lobby on religious grounds, when comparable secular holiday displays by other private groups are permitted, constitutes viewpoint-based discrimination in violation of the Free Speech Clause of the First Amendment. Rabbi Grossbaum and Lubavitch submit that their menorah, a religious symbolic display, constitutes protected speech on the "holiday season," an "includible subject" for discussion in the City-County Building lobby. In their view, the district court erred in refusing to recognize that the Building Authority had identified the "holiday season" as a "meaningful category or subject matter for speech." The Building Authority responds that the district court correctly portrayed its Policy, and that the plaintiffs' characterization of the Policy as a "seasonal display" or a "holiday season" policy is incorrect. By creating a policy which prohibits all religious displays and symbols, the Building Authority submits, it properly exerted its right to exercise control over the nonpublic forum lobby in a reasonable and viewpoint-neutral manner. In fact, it claims that its Board "neither proposed, adopted nor intended a ban on only seasonal religious displays." Appellees' Br. at 20.
 
 
 36
 a.
 
 
 37
 The district court upheld the Building Authority's Policy on the basis that "the holiday season" was "too broad and too amorphous to be treated as a 'subject' " on which the plaintiffs' menorah expresses a religious viewpoint. 870 F.Supp. at 1461. We begin our review of the district court's conclusion by turning to the Policy itself. The Building Authority's "Policy on Seasonal Displays in the City-County Building" announces its subject in its title; it clearly concerns "seasonal displays" in its government building. The Policy, although perhaps not artfully written, clearly is a prohibition of one type of seasonal display, namely religious displays and symbols. The justification for that prohibition was straightforwardly presented: "[T]he display of seasonal religious symbols in the halls of government conveys the appearance of governmental endorsement of religion in violation of the Establishment Clause of the First Amendment of the Federal Constitution." We cannot accept the view that such a subject category is too broad or amorphous to serve as a "subject" for the purpose of forum analysis. The subject of the "holiday season" is a conceptually well-defined subject; indeed, the Board of the Building Authority had a meeting to discuss this very subject and had arrived at a specific, easily understood resolution. It had no difficulty recognizing the "holiday season" as a topic of discussion. In his memorandum to the Board prior to the October 4, 1993 meeting, General Manager Reinking stated that the need for a written policy arose after unwanted publicity during the 1992 "holiday season."[9] The minutes of the October 4, 1993 meeting reflected a continuation of the Board's consideration of the events of "last year's holiday season" which created the need for a "policy on seasonal displays." The Board unanimously adopted the Policy. At the next meeting, on December 6, 1993, the Board, asked to interpret the Policy on Seasonal Displays, decided that a Christmas tree could be put in the lobby, consistent with the Policy as previously adopted, because it was secular in nature.[10] See App. at 165-69.
 
 
 38
 The record of lobby use before the Policy was enacted, which the district court declined, wrongly in our opinion, to consider, indicates that the Building Authority in the past had allowed both religious and secular holiday displays by private and public groups. See App. at 40, 69, 72, 134. In fact, the notations on the written requests for use of the lobby suggest that the Building Authority's Policy was based entirely on availability of the space, and not on the content or speaker involved. After the Policy was enacted, the Board's discussion at its December 6, 1993 meeting suggested that the only change to its practice of granting use of its lobby was that seasonal religious symbols were not permitted. We conclude that, based on the Policy as it was written, and based on the Building Authority's practice of granting permission to use the lobby both before and after the enactment of the Policy, the Policy's prohibition can be characterized only as one based on seasonal displays in the City-County Building that express a religious perspective on the season.
 
 
 39
 b.
 
 
 40
 Realizing that Lamb's Chapel indicates a result opposite from the one it reached, the district court attempted to distinguish that case from the one before it. On appeal, the defendants now urge that we accept some of those distinctions. Consequently, in reaching our decision, we have examined Lamb's Chapel with great care. In that case, the Supreme Court acknowledged that a school district, "like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." --- U.S. at ----, 113 S.Ct. at 2146. It then held that, when a school district opens school facilities for use by community groups for a wide variety of social, civic, and recreational purposes, its formal policy against opening those facilities to a group seeking to show a film addressing child-rearing questions from a "Christian perspective" was viewpoint discrimination:
 
 
 41
 That all religions and all uses for religious purposes are treated alike under [the policy in question], however, does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint.
 
 
 42
 Id. at ----, 113 S.Ct. at 2147. The Court focused on two of the school district's rules for regulating use of school property when not in use for school purposes. Rule 10 authorized "social, civic, or recreational uses," and Rule 7 prohibited its use "by any group for religious purposes." The Court concluded that Rule 7, forbidding any use for religious purposes, was unconstitutionally applied. The denial of the application to exhibit the film on child-rearing questions solely because the presentation was from a religious perspective was constitutionally impermissible viewpoint discrimination. Id. The Court then applied the teachings of Cornelius:
 
 
 43
 Although a speaker may be excluded from a non-public forum if he wishes to address a topic not encompassed within the purpose of the forum ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.
 
 
 44
 Id. (quoting Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451). The Court concluded that the government was regulating speech by favoring some viewpoints over others in violation of the First Amendment. Id. at ---- - ----, 113 S.Ct. at 2147-48. As the Eighth Circuit noted in Good News/Good Sports Club v. School District, 28 F.3d 1501 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995), Lamb's Chapel recognized that "a religious viewpoint can constitute a separate viewpoint on a wide variety of seemingly secular subject matter. Viewpoint is synonymous with perspective." Id. at 1506.
 
 
 45
 The defendants submit that the case before us is different from Lamb's Chapel. In Lamb's Chapel, Rule 10 allowed (i.e., "opened the forum" to) use of the school for social, civic, and recreational topics, and Rule 7 expressly excluded religious viewpoints. The "subject matter"--social, civic and recreational topics--was expressly stated and the exclusion of a religious viewpoint on these otherwise includible subjects was discriminatory. By contrast, in this case, defendants submit, there was no explicit delineation of which subjects were permitted. Therefore, the Policy did not regulate viewpoints on a list of permitted subjects; it simply eliminated one subject, religion, from the subjects that could be discussed in this nonpublic forum. Therefore, the Building Authority claims that it properly exerted its right to exercise its control over the nonpublic forum lobby in a reasonable and viewpoint-neutral manner: Its Policy prohibits all religious displays and symbols. It further suggests that there is no evidence that it would allow, under private sponsorship, secular seasonal holiday displays.
 
 
 46
 We cannot accept these attempts to distinguish the clear teaching of Lamb's Chapel. As the court's colloquy with counsel at oral argument made quite clear, the Policy challenged here was constructed to prevent one thing: seasonal holiday displays of a religious character. The absence of an explicit list of permissible subjects upon which discourse is permissible in this nonpublic forum does not mean that there is no "otherwise includible subject" for discussion in the forum. In Hedges, 9 F.3d at 1296-97, for example, the school board announced two policies prohibiting the distribution of "written material that is of a religious nature" and "written material ... which expresses religious beliefs or points of view." This court recognized that the policies impliedly allowed the distribution of all other written material, and concluded that the prohibition of religious speech was unconstitutional. See also Good News/Good Sports Club, 28 F.3d at 1506-07 (holding that a policy generally encouraging the moral character and development of youth by permitting on school premises the Boy Scouts and Girl Scouts, but not permitting a religious youth organization, violates the First Amendment's prohibition of viewpoint discrimination); Searcey v. Crim, 815 F.2d 1389 (11th Cir.1987) (holding that the exclusion of "peace activists" from "career days" when military recruiters were permitted access was viewpoint-based administration); cf. AIDS Action Comm. of Mass., Inc. v. Massachusetts Bay Transp. Auth., 42 F.3d 1, 11-12 (1st Cir.1994) (finding viewpoint discrimination in application of transit authority policy that prohibited the display of AIDS advertisements but allowed the display of sexually explicit movie advertisements).
 
 
 47
 Any lingering doubts about whether the religious displays prohibited by the Policy are properly characterized as "viewpoint" rather than "subject matter" have been dispelled by the Supreme Court's recent pronouncement in Rosenberger v. Rector & Visitors of the University of Virginia, --- U.S. ----, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). In Rosenberger, the University of Virginia, a state entity, denied authorization for paying the printing costs of the petitioners, a student publication, solely because their paper "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." Id. at ----, 115 S.Ct. at 2513. The Court treated the Student Activities Fund ("SAF"), from which payment for student groups is made, as a limited forum, even if "more in a metaphysical than in a spatial or geographic sense," id. at ----, 115 S.Ct. at 2517, and treated it as a limited public forum that can be preserved for certain uses, as were the school facilities in Lamb's Chapel.
 
 
 48
 Relying on Lamb's Chapel, Cornelius, and Perry as apposite precedents, the Court elaborated on the parameters within which the government may regulate speech[11] and explained that the "necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." Id. at ---- - ----, 115 S.Ct. at 2516-17. Nevertheless, "[o]nce it has opened a limited forum, ... the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." Id. at ----, 115 S.Ct. at 2517 (citations omitted). The Court's method for weighing the constitutionality of the State's actions, therefore, is to decide the legitimacy of the State's reasons for discriminating:
 
 
 49
 Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.
 
 
 50
 Id.
 
 
 51
 In Rosenberger, as in our case, the government entity claimed that the exclusion of religious material was based on content, not viewpoint. The Court recognized that the distinction between content and viewpoint "is not a precise one," and that the treatment of religious thought as a viewpoint rather than a "comprehensive body of thought" is "something of an understatement" when such issues "have been subjects of philosophic inquiry throughout human history." Id. And yet, within this context, it is a viewpoint.
 
 
 52
 We conclude, nonetheless, that here, as in Lamb's Chapel, viewpoint discrimination is the proper way to interpret the University's objections to [the excluded organization]. By the very terms of [its] prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.
 
 
 53
 Id. at ---- - ----, 115 S.Ct. at 2517-18. The Court concluded that the University's denial of the request for payments was based upon viewpoint discrimination like that found in Lamb's Chapel. In Rosenberger, as in Lamb's Chapel, the excluded group would have been qualified as an organization had it not had an underlying religious outlook. In both cases, the government's justification for denying the group's message was based solely on the avowedly religious perspective of the organization's publication. The Court held "that the regulation invoked to deny SAF support, both in its terms and in its application to these petitioners, is a denial of their right of free speech guaranteed by the First Amendment." Id. at ----, 115 S.Ct. at 2520.
 
 
 54
 In the case before us, the excluded group, Lubavitch, seeking to display the menorah, had already been qualified as a permissible organization to use the lobby for years. Others with non-religious messages remain free to apply for space in the City-County Building. The Board's justification for denying the menorah display in its Policy was expressly that it was religious. In this case, therefore, consistent with the Supreme Court in Rosenberger and Lamb's Chapel, we hold that the prohibition of the menorah's message because of its religious perspective was unconstitutional under the First Amendment's Free Speech Clause.[12]
 
 C. The Establishment Clause Defense
 
 55
 The Building Authority submits that its exclusion of the plaintiffs also is justified because a display of seasonal religious symbols in the seat of government conveys the appearance of governmental endorsement of religion in violation of the Establishment Clause. The district court determined that the plaintiffs were not entitled to a preliminary injunction because they had no right to express their religious views in the lobby of the City-County Building. Therefore, it was unnecessary for the court to decide whether a potential Establishment Clause violation excused the defendant officials from permitting the expression. Nevertheless, the court did address this argument and determined that, assuming that the issue had to be addressed, there was, on the record before it, no countervailing Establishment Clause concern sufficiently strong to require the curtailment of otherwise permissible expression.
 
 
 56
 The court noted that the same menorah had been placed in the lobby from 1985 to 1992. In its view, there was "little danger that reasonable onlookers would think that the menorah was being displayed with the government's endorsement of any religious message." 870 F.Supp. at 1464. Noting that neutrality and equal access to the lobby would avoid Establishment Clause problems, the court concluded that the defendants' Establishment Clause defense was insufficient because the defendants had failed to demonstrate how the menorah display would suggest endorsement:
 
 
 57
 The Building Authority has not presented evidence that would support a finding that plaintiffs' display would so dominate the lobby that a formal policy of equal access and neutrality would be likely to "degenerate into endorsement."
 
 
 58
 870 F.Supp. at 1465. Because we have held that the district court erred in its freedom of expression analysis, we must address whether Establishment Clause concerns require that the government exclude the plaintiffs from the nonpublic forum that the defendants have established. For the reasons that follow, we agree with the district court that, on this record, the Establishment Clause provides no justification for excluding the plaintiffs from the non-forum that they have established.
 
 1.
 
 59
 At the outset, we note that the Supreme Court has made clear that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." See Capitol Square Review & Advisory Bd. v. Pinette, --- U.S. at ----, ----, 115 S.Ct. 2440, 2446 (1995). "[T]he interest of the State in avoiding an Establishment clause violation 'may be [a] compelling' one justifying an abridgment of free speech otherwise protected by the First Amendment." Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2148 (quoting Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981)).
 
 
 60
 Despite this potential limitation on access to a forum established by the government, we believe that the district court correctly applied--and anticipated--the Supreme Court's approach in this most delicate of areas. The Supreme Court's recent cases make it clear that a governmental position of neutrality of access and evenhanded treatment of speakers is a significant factor in assessing a concern that the presence of religious expression in the government-created forum amounts to a violation of the Establishment Clause:
 
 
 61
 A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion.... More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design.
 
 
 62
 Rosenberger, --- U.S. at ----, 115 S.Ct. at 2522 (citations omitted); see also Capitol Square Review, --- U.S. at ----, 115 S.Ct. at 2447; Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2148; Board of Educ. of Westside Community Schs. v. Mergens, 496 U.S. 226, 235, 110 S.Ct. 2356, 2364, 110 L.Ed.2d 191 (1990); Widmar, 454 U.S. at 274-75, 102 S.Ct. at 277. This court also has regularly noted that maintaining a neutral policy avoids establishment of religion difficulties. See Hedges, 9 F.3d at 1299 (finding no neutrality in school district's suppression of private speech); Sherman v. Community Consol. Sch. Dist. 21, 8 F.3d 1160, 1165 (7th Cir.1993) (finding evenhanded treatment of religious and nonreligious youth groups), cert. denied, --- U.S. ----, 114 S.Ct. 2109, 128 L.Ed.2d 669 (1994); American Jewish Congress v. City of Chicago, 827 F.2d 120, 124 (7th Cir.1987) (stating principle that government should not favor one religion over another religion or over non-religion); see also Good News/Good Sports Club, 28 F.3d at 1510 (holding that school policy did not advance religion, but established a neutral forum for community and student groups to engage in exchange of ideas).
 
 
 63
 In Rosenberger, the Supreme Court, through the pen of Justice Kennedy, set forth the approach that ought to govern the adjudication of lower courts in striking the appropriate balance between freedom of expression and the concerns protected by the Establishment Clause:
 
 
 64
 If there is to be an assurance that the Establishment Clause retains its force in guarding against those governmental actions it was intended to prohibit, we must in each case inquire first into the purpose and object of the governmental action in question and then into the practical details of the program's operation.
 
 
 65
 --- U.S. at ----, 115 S.Ct. at 2521. Following this approach, the Supreme Court concluded that the restriction on free expression that resulted from the University's exclusion of religiously oriented publications from its activities fee was not excused by its concern that it must comply with the strictures of the Establishment Clause. The Court first determined that the University's program, the student activities fee, was neutral toward religion.[13] The Court noted that, if there was a benefit to religion, it was "incidental to the government's provision of secular services for secular purposes on a religion-neutral basis." Id. at ----, 115 S.Ct. at 2524. The Court also explained that a university's scrutiny of student speech to ensure that its publications "meet some baseline standard of secular orthodoxy" raised "the specter of governmental censorship" and would "imperil the very sources of free speech and expression." Id. It then concluded:
 
 
 66
 To obey the Establishment Clause, it was not necessary for the University to deny eligibility to student publications because of their viewpoint. The neutrality commanded of the State by the separate Clauses of the First Amendment was compromised by the University's course of action. The viewpoint discrimination inherent in the University's regulation required public officials to scan and interpret student publications to discern their underlying philosophic assumptions respecting religious theory and belief. That course of action was the denial of the right of free speech and would risk fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires. There is no Establishment Clause violation in the University's honoring its duties under the Free Speech Clause.
 
 
 67
 Id. at ----, 115 S.Ct. at 2524-25.
 
 
 68
 The Supreme Court's recent decision, Capitol Square Review, also followed the approach of Rosenberger. In addition to emphasizing the general principle that the opening of government property for religious speech does not confer any imprimatur of state approval on religious sects or practices, --- U.S. at ----, 115 S.Ct. at 2447 (citing Widmar, 454 U.S. at 274, 102 S.Ct. at 276), the Court inquired "first into the purpose and object of the governmental action in question and then into the practical details of the program's operation." Rosenberger, --- U.S. at ----, 115 S.Ct. at 2521. In Capitol Square,[14] the Board had rejected the display of the Ku Klux Klan's cross on its public square precisely because its content was religious; its proffered reason for denying the Klan's request was that the State had an interest in avoiding official endorsement of Christianity under the Establishment Clause. The Supreme Court agreed that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." Capitol Square, --- U.S. at ----, 115 S.Ct. at 2446 (citing Lamb's Chapel and Widmar ). Nevertheless, following Lamb's Chapel and Widmar, it rejected the Establishment Clause defense. "The state did not sponsor the respondent's expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the same application process and on the same terms required of other private groups." --- U.S. at ----, 115 S.Ct. at 2453.
 
 2.
 
 69
 Following the methodology outlined by the Supreme Court in Rosenberger and applied by the Court in that case and in Capitol Square, we turn now to this case. At the outset, it is very apparent that, in many significant ways, we have before us a case very similar to those just adjudicated by the Supreme Court. Notably, we are confronted, as were the Justices, with a case in which the governmental authorities have chosen to open governmental property to some forms of private expression. As we have noted earlier in this opinion, it is clear that the holiday season is a subject to which the City-County Building has been opened for non-governmental, private discourse. The record also establishes, as the district court noted in its opinion, that, prior to the restrictions at issue in this case, the same menorah had been placed in the lobby by the plaintiffs for a significant number of years. At oral argument, the Building Authority made no claim that an application for space by the plaintiffs or any other religious group would receive any different treatment or be subject to any other procedure than the one used to process the applications of other groups.
 
 
 70
 As in Capitol Square, this case involves religious expression at or near the seat of government. In the view of the Building Authority, the placement of a menorah in the actual seat of government signals government endorsement of a religious symbol, and not even the posting of disclaimer signs on the display would be enough to mitigate the appearance of government endorsement there. The recent Supreme Court cases fail to give us definitive guidance on the appropriate assessment of the "seat of government" consideration. In Capitol Square, a plurality of four of the Justices would have rejected the argument that private religious expression at the seat of government can be characterized as constituting a governmental endorsement of religion when the government has opened the forum to private speakers on equal terms. Three other Justices did not believe that such a definitive exception was necessary, but believed that, given the totality of circumstances in the case, no reasonable person could consider the display in question as an endorsement of a religious point of view by the state. Among the factors which ought to be considered, they pointed out, was an awareness that the forum is open to all as a place in which expressive conduct may take place. As Justice O'Connor wrote, "the endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice." --- U.S. at ----, 115 S.Ct. at 2456 (O'Connor, J., concurring).
 
 
 71
 We were confronted with a religious display at the seat of government in American Jewish Congress v. City of Chicago, 827 F.2d 120 (7th Cir.1987). We concluded that the nativity scene at issue "communicate[d] a message of government endorsement," id. at 128, despite disclaimer signs. Unlike the situation before us today, or the situation before the Justices in Capitol Square, the nativity scene in City of Chicago was not placed in a forum open to discourse by other private groups. There was, prior to the placement of disclaimers after earlier litigation, a history of official endorsement. Moreover, the centrality of the location of the nativity scene did not lend itself to the interpretation that it was the expression of one speaker in a forum open to all. Indeed, the Mayor of Chicago had ordered that the nativity scene be replaced in the lobby of City Hall following public reaction to his earlier order to dismantle the display. In short, it was a self-contained religious symbol, the only religious display in City Hall, and separate from the many secular holiday decorations in and around the building. In contrast, most religious display cases to consider the proximity of the seat of government as a factor in its Establishment Clause analysis have been public forum cases. In general terms, these cases hold that, despite the close proximity of religious symbols to the seat of government, authorities constitutionally may permit private religious speech equal access to the property on equal terms with other private speakers.[15] As we have already noted, when evaluating the viability of an Establishment Clause defense, Lamb's Chapel suggests that an evenhanded, neutral right of access is just as important in evaluating nonpublic or limited forums as it is in evaluating public forums.[16]
 
 
 72
 On the basis of the record before us on this denial of a preliminary injunction, we cannot say that the district court erred when it concluded that the placement of the menorah in the lobby of the City-County building of Indianapolis, pursuant to an evenhanded policy of allowing expression on the holiday season, raises no Establishment Clause concerns of such countervailing importance as to outweigh the plaintiffs' right to free expression.
 
 Conclusion
 
 73
 Because we believe that the district court erred by not acknowledging the right of the plaintiffs to exercise their rights of free expression in the nonpublic forum created by the Building Authority on the same terms as all other persons, regardless of the religious or non-religious nature of their message, we must reverse the judgment of the district court.
 
 
 74
 REVERSED.
 
 
 
 [1]
 The factual record in this case is not disputed. The parties submitted Joint Stipulations of Fact, R.9. The facts recited in this opinion derive from those stipulations and from other uncontested facts offered by the parties at the district court hearing
 
 
 [2]
 There clearly was no policy to prohibit the sale of goods in the lobby, however. Requests for use of the lobby for the sale of Girl Scout cookies and the Indianapolis Bar Association dinner tickets were approved, for example. See, e.g., App. at 36, 42, 46, 54, 66, 67, 69, 158. The notations made by Mr. Reinking on the written requests for space indicated that the decision was made on the basis of availability of space
 
 
 [3]
 The menorah is a nine-pronged candelabrum that is displayed during the eight days of Chanukah, and is lit each night of the festival. It is a religious symbol associated with the holiday. Joint Stipulation 10, R.9 at 3
 
 
 [4]
 On November 29, 1994, this court granted plaintiffs' motion for an injunction pending resolution of this appeal. Lubavitch was therefore permitted to erect its menorah display during Chanukah 1994
 
 
 [5]
 In addition to its constitutional defense, the Building Authority presents a defense of laches to bar injunctive relief. It claims Lubavitch unreasonably delayed commencing this action. According to the defendants, Lubavitch knew of the Authority's refusal to display the menorah more than a year earlier, but filed the lawsuit only twenty days prior to Chanukah, without giving reasons for the delay
 This defense is without merit. Rabbi Grossbaum wrote to Mr. Reinking on June 27, 1994, again requesting permission for the menorah display. He asked whether the Building Authority had reconsidered its Policy and asked for an explanation if the menorah would not be allowed. Because he received no response, the Rabbi wrote again on August 4, 1994. Mr. Reinking replied by letter on August 9, 1994; he explained that the Policy "does not permit the display of seasonal religious symbols in the building," and denied Rabbi Grossbaum's request. Less than three months later, on November 7, 1994, the plaintiffs filed their verified complaint in the United States District Court in the Southern District of Indiana. See App. at 176-78. In addition, defendants did not claim that they were harmed. Mere delay is not enough; prejudice must also be shown. Gardner v. Panama R.R., 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (per curiam); NLRB v. P*I*E Nationwide, Inc., 894 F.2d 887, 894 (7th Cir.1990).
 
 
 [6]
 The First Amendment of the United States Constitution provides in pertinent part:
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.
 U.S. Const. amend. I.
 
 
 [7]
 See Doe v. Small, 964 F.2d 611, 618-19 (7th Cir.1992) (en banc) (paintings of the life of Christ are protected religious speech); see also Chabad-Lubavitch v. Miller, 5 F.3d 1383, 1387 (11th Cir.1993) (listing cases); Congregation of Lubavitch v. City of Cincinnati, 997 F.2d 1160, 1164 (6th Cir.1993) (citing Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989))
 
 
 [8]
 Krishna Consciousness discusses the same three categories:
 Under this approach, regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny. Such regulations survive only if they are narrowly drawn to achieve a compelling state interest. Perry, supra, 460 U.S. at 45, 103 S.Ct. at 955.... The second category of public property is the designated public forum, whether of a limited or unlimited character--property that the state has opened for expressive activity by part or all of the public. Ibid. Regulation of such property is subject to the same limitations as that governing a traditional public forum. Id. at 46, 103 S.Ct. at 955.... Finally, there is all remaining public property. Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view. Ibid.
 Id. at ---- - ----, 112 S.Ct. at 2705-06.
 
 
 [9]
 Mr. Reinking's statement concerning the need for a display policy is as follows:
 The attention and publicity focused on the lobby of the City-County Building during the holiday season of 1992 pointed out the need for the authority to have a written policy regarding displays in our building. Last year's holiday season brought newspaper articles, correspondence from the Indiana Civil Liberties Union and research into constitutional law. I am hopeful that an appropriate policy can facilitate a less controversial season in this and future years.
 Included in this mailing is a draft of a policy on seasonal displays which Howard Kahlenbeck has prepared. Howard will discuss this draft, and the pertinent issues associated with the establishment of such a policy, with the directors at the meeting on Monday, October 4, 1993.
 App. at 159 (emphasis added).
 
 
 [10]
 There was no discussion at any of these meetings that the secular display could be placed in the lobby because it was sponsored or erected by the government rather than a private organization. The discriminating characteristic that allowed the Christmas tree display and prohibited the menorah was solely that the former was a secular symbol and the latter a religious one. The distinction was made on the basis of what was said, not who was speaking
 
 
 [11]
 The Court explained:
 It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. Discrimination against speech because of its message is presumed to be unconstitutional.... When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.
 Id. at ----, 115 S.Ct. at 2516 (citations omitted).
 
 
 [12]
 The district court and the Building Authority rely on Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341 (7th Cir.1990), as relevant authority. This reliance is misplaced; the legal claims relating to the religious displays and the policies at issue in Chabad House and in this case are not similar. In Chabad House, the airport displayed non-religious decorations and prevented all private displays at O'Hare, including religious displays of the type at issue in this case. The court held that this situation did not constitute discrimination against religion. The City could use its own property to send a non-religious holiday message without opening its property to messages by others. In this case, by contrast, the Policy selectively allows private access for secular holiday displays, while excluding access for all private holiday displays expressing a religious viewpoint
 
 
 [13]
 The Rosenberger Court stated:
 It does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups which use meeting rooms for sectarian activities, accompanied by some devotional exercises.
 Id. at ----, 115 S.Ct. at 2523.
 
 
 [14]
 Capitol Square involved a "full-fledged public forum" rather than a limited forum case. However, as the Court pointed out in Capitol Square by its reference to Lamb's Chapel, the same principle applies in nonpublic forum cases
 
 
 [15]
 See, e.g., Chabad-Lubavitch v. Miller, 5 F.3d 1383 (11th Cir.1993) (en banc) (reversing to permit Chabad-Lubavitch to erect a menorah in Rotunda, a public forum); Americans United for Separation of Church & State v. City of Grand Rapids, 980 F.2d 1538 (6th Cir.1992) (en banc) (holding there was no Establishment Clause violation in displaying a privately funded menorah during Chanukah in the public plaza on which city hall and county building are located). But see Chabad-Lubavitch v. City of Burlington, 936 F.2d 109 (2d Cir.1991) (per curiam) (holding that display of unattended menorah in City Hall Park, quite close to seat of government, violated Establishment Clause because its combination alongside a secular holiday display did not cause a viewer to see the exhibit "as a whole" or as a unitary symbol), cert. denied, --- U.S. ----, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992); Kaplan v. City of Burlington, 891 F.2d 1024, 1030 (2d Cir.1989) (holding that display of solitary semi-permanent menorah in City Hall Park, closely associated with seat of city government, violates the Establishment Clause), cert. denied, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990)
 
 
 [16]
 Cf. County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (holding that the display of a privately sponsored creche on the staircase of the courthouse violated the Establishment Clause because the display actually favored sectarian religious expression). In Allegheny, the Court evaluated the effect of the government conduct and determined that "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their religious choices." 492 U.S. at 597, 109 S.Ct. at 3103